**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

FILED

2010 JUN 21 : A 9: 30

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| L-3 SERVICES, INC.<br>1195 Freedom Drive<br>Reston, Virginia  20190<br><br>and<br><br>BINARY IONIZATION, INC.<br>10770 Wateridge Circle, Suite 200<br>San Diego, California  92121<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY SZEKELY<br>7703 Twin Lakes Drive<br>Morrow, Ohio  45152<br><br>and<br><br>RALPH SIAS<br>3709 Hillview Way<br>Oceanside, California  92056<br><br>and<br><br>PAUL STOLZ<br>14195 Shadywood Drive, Apt. 4<br>Plymouth, Michigan 48170<br><br>and<br><br>MARK HALE<br>1923 Woodbine Drive<br>Canton, Michigan  48188 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. _1:10cv687_<br>)  _GBL  /TRJ_<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

5102498

|  |  |
|---|---|
| and | ) |
|  | ) |
| ADVANCED DISINFECTION | ) |
| TECHNOLOGIES, LLC, | ) |
| 2996 Henkle Drive | ) |
| Lebanon, Ohio  45036 | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT

Plaintiffs L-3 Services, Inc. and Binary Ionization, Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby bring this action against Defendants for patent infringement, violations of the Virginia and California Trade Secrets Acts, breaches of contracts, RICO violation, violation of the Virginia business conspiracy statute, and violation of the Lanham Act, averring as follows:

### The Parties

1.      Plaintiff L-3 Services, Inc. (formerly named L-3 Communications Titan Corp.) (hereinafter "L-3") is a Delaware corporation with its principal place of business at 11955 Freedom Dr., Reston, VA.  L-3 is in the business of, *inter alia*, providing various engineering services for military and commercial applications.  L-3 and its various divisions also build, promote, market and sell products based on technologies developed by its Binary Ionization division.

2.      Plaintiff Binary Ionization Inc. ("BII"), a subsidiary of L-3, is a Delaware corporation with its principal place of business at 10770 Wateridge Circle, Suite 200, San Diego, California, 92121.

3.      Defendant Jeffrey Szekely ("Szekely"), is an Ohio resident and is currently Chief Executive Officer of Defendant Advanced Disinfection Technologies, LLC's ("ADTec").

2

4.     Szekely is a former L-3 consultant.

5.     Defendant Paul Stolz ("Stolz") is a Michigan resident and ADTec's Chief Operating Officer.

6.     Defendant Mark A. Hale ("Hale") is a Michigan resident.

7.     Defendant Ralph Sias ("Sias"), a former L-3 employee, is a California resident.

8.     Defendant ADTec is a Michigan limited liability company with its principal place of business at 2996 Henkle Drive, Suite J, Lebanon, Ohio 45036.

9.     ADTec maintains a website located at http://www.adtecbio.com.

10.     ADTec's entire business consists of selling products and services containing Plaintiffs' patented, trade secret and proprietary bio-decontamination technology that was stolen by Defendants.

## Jurisdiction and Venue

11.     This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this dispute arises under the laws of the United States.

12.     This Court also has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1338(a) and (b) because the dispute involves matters of United States patent law and unfair competition related to claims under United States patent law, respectively.

13.     This Court has pendant and/or ancillary jurisdiction over the state law and other claims herein, which arise from and involve the same operative facts and circumstances.

14.     This Court has personal jurisdiction over Defendant Szekely by virtue of a valid forum selection clause in at least two contracts between L-3 and Szekely (hereinafter "L-3/Szekely contracts"), out of which this dispute arises. Each contract contains the following language:

> This Agreement shall be governed by the laws of the Commonwealth of Virginia, excepting its principles on conflicts of law. All disputes arising out of or related to this Agreement will be subject to the exclusive jurisdiction and venue of the Virginia state and federal courts located in Fairfax County or Alexandria, Virginia, and the parties hereby consent to such jurisdiction and venue.

2006 and 2008 L-3/Szekely contracts, ¶ 22, a true and correct copy of which are incorporated herein by reference and attached hereto at **Exhibits A and B** respectively.

15.     This Court has personal jurisdiction over all other Defendants under 18 U.S.C. §§ 1964(a) and 1965(a) and (d) because personal jurisdiction is proper over Szekely in Virginia and he is an agent of all other Defendants/co-conspirators.

16.     This Court also has personal jurisdiction over all Defendants under the Virginia Long Arm Statute Va. Code §§ 8.01-328.1(A)(1)-(3) by virtue of actions taken in this division of this judicial district in Virginia by each Defendant, and the fact that Plaintiff L-3, which is a resident of this division of this judicial district of Virginia, has been and will continue to be harmed by those actions.

17.     Venue is proper in the Alexandria Division of this Court pursuant to 28 U.S.C. § 1391, Local Civil Rules 3(B)(1) and (C), and the above-mentioned forum selection clause in the L-3/Szekely contracts.

## Facts Common To All Counts

## Background

18.     This case involves Defendants' brazen conspiracy and misappropriation of Plaintiffs' innovative and highly valuable anti-biochemical warfare technology, along with its customers, contacts and other trade secrets.

19.     Plaintiffs' technology, known as binary ionization technology ("BIT™"), has become important in military applications as well as all situations involving public health, including hospitals, prisons, nursing homes, dental and veterinary offices, health clubs, cruise ships and more.

20.     Hospitals, in particular, face a daily battle against the spread of life threatening infections, known as Hospital Acquired Infections ("HAIs"), that many patients contract while in the hospital.

21.     According to the United States Centers for Disease Control and Prevention ("CDC"), each year, nearly 2 million people contract HAIs, of which around 99,000 die.  The CDC estimates that the annual medical costs to United States hospitals to treat HAIs is about $5.7 Billion annually. Cost to patients that survive, insurance company losses and medicare/government losses are not included in this figure.

22.     L-3 and BII are among industry leaders in developing products containing BIT™ technology to combat infection and neutralize bio-chemical threats.

23.     The term "binary ionization technology," refers to the two key aspects of Plaintiffs' technology that make it so effective: (1) disassociating the two elements that compose hydrogen peroxide molecules (binary) and (2) imparting a charge to them (ionization) as they pass through an ionized plasma field, resulting in electrostatically-charged reactive oxidative species ("ROS").

24.     The ROS kills biological agents (including deadly viruses, molds, bacteria, bacterial spores, anthrax and the like) that otherwise can live up to 30 days, on contact by lysing cells, and leaves no residue or by-product requiring additional clean-up.

25.    Plaintiffs' product line embodying binary ionization technology has been named "SteraMist™."

26.    SteraMist™ systems have been used by the United States Biological Combat Assessment System Program and The Airborne Warning and Control System Program. Commercially, the SteraMist™ room fogger is the centerpiece of Plaintiffs' product line and took approximately 6 (six) years to develop.



27.    The SteraMist ™ fogger has many uses, including decontaminating surfaces at hospitals, tissue banks, pharmaceutical manufacturing facilities, clean rooms, etc.

28.    Plaintiffs also developed SteraMist ™ spray guns, chambers, backpacks and hand-cleaners.

29.    Among other patents, BII owns four patents on the SteraMist™ BIT™ technology.

30.    BII owns United States Patent No. 6,343,425 (the "'425 patent"), which issued on February 5, 2002, and is entitled Measurement and Cleaning of Elastomeric Articles Having Particulate Adhered Thereto.

31.     BII also owns United States Patent No. 6,706,243 (the "'243 patent"), which issued on March 16, 2004, and is entitled Apparatus and Method For Cleaning Particulate Matter and Chemical Contaminants From a Hand.

32.     BII also owns United States Patent No. 6,969,487 (the "'487 patent"), which issued on November 29, 2005, and is entitled Denaturing of a Biochemical Agent Using an Activated Cleaning Fluid Mist.

33.     BII also owns United States Patent No. 7,008,592 ("the '592 patent"), which issued on March 7, 2006, and is entitled Decontamination Apparatus And Method Using An Activated Cleaning Fluid Mist.

34.     The '592 patent covers the SteraMist™ room fogger.

35.     The '592 patent, the '425 patent, the '243 patent and the '487 patent are related, and all recite inventions relating to decontamination technology.

36.     Because of its proprietary technology, the patented SteraMist™ devices and methods produce higher kill rates and disinfect target rooms and areas more quickly and efficiently than other methods of sterilization.

37.     Plaintiffs have also developed know-how and improvement technology relating to these inventions which is not generally known and derives actual and potential independent economic value from not being generally known and by not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

38.     Such know-how and improvement technology are considered to be trade secrets of Plaintiffs.

39.     Plaintiffs protect these trade secrets with measures that are reasonable to maintain their secrecy.

40.     Specifically, each and every L-3 employee and consultant signs a confidentiality agreement at the beginning and end of his or her service with L-3.

41.     L-3's and BII's premises are kept under tight security, requiring identification to enter the building, and a pass key to enter into each working area.

42.     Neither L-3 nor BII discloses trade secret information to any third party without first obtaining a signed a Confidentiality Agreement from the third party.  Confidentiality Agreements or Non-Disclosure Agreements are required before L-3 participates in any discussions with third parties, including consultants.

### Defendant Ralph Sias's Relationship with L-3

43.     Defendant Ralph Sias worked for L-3's Applied Technologies Group, from November 2002 until March 2010.

44.     Sias began his tenure as a scientist in the Simulation, Engineering & Testing division and, then in late 2006 became the leader of L-3's efforts to commercialize BIT™ technology, earning the executive-level title of Director of Research and Development-Binary Ionization Technology.

45.     At the beginning of his employment, Sias signed a Confidentiality Agreement and Assignment of Inventions ("L-3/Sias Confidentiality/Invention Assignment Agreement").  The specific purpose of this agreement was:

> to protect the trade secrets and other proprietary and confidential information of the Company and the Company's right to certain Inventions by Employee, in order to assure the Company's ability to continue its business and furnish employment to its employees and to preserve and protect the secrets if the United States Government, Customers and others which are entrusted to the Company.

L-3/Sias Confidentiality/Inventor Agreement, ¶ 3, a true and correct copy of which is incorporated herein by reference and attached hereto as **Exhibit C.**

46. Paragraph 4 of the L-3/Sias Confidentiality/Invention Assignment Agreement states in relevant part as follows:

> The Employee agrees to maintain the confidentiality of all Confidential Information, both during and subsequent to any periods of employment with the Company, and employee will not, without express written authorization by the Company, directly or indirectly reveal or cause to be revealed any such Confidential Information to any person other than to Company employees who are authorized to receive such Confidential Information in order to perform their duties for the Company, nor will Employee use any such Confidential Information to the detriment of the Company or its Customers or other than in the course of employment with the Company, and in no case will the employee use this data for the employee's own personal gain.

**Exhibit C.**

47. Paragraph 6 of the L-3/Sias Confidentiality/Invention Assignment Agreement also required Sias to assign and transfer to L-3 the entire right, title and interest in <u>all</u> inventions whether conceived in whole or part by him during his employment with L-3. It further mandates that Sias assist L-3 in every reasonable way after his employment ends to defend the Company's title to any inventions in any county, which patents shall remain the sole and exclusive property of the Company or its nominee. *Id.*

48. Sias has a B.S. in Physics from the University of California at Los Angeles and over thirty years of experience in product development in the medical industry, particularly in infection prevention and sterilization.

49. Sias is an inventor named on the following BII patents: '592 patent, the '425 patent, the '243 patent and the '487 patent.

50. L-3 hired Sias to engineer, design and test products containing BII's patented BIT™ technology.

51. L-3 terminated Sias as part of a structured layoff in March 2010 and provided him with severance benefits and outplacement services that were terminated on about March 18, 2010 when L-3 learned of Sias's involvement in this scheme.

52. Upon termination, Sias reiterated his contractual obligation to preserve L-3's confidential trade secrets, confidential knowledge, all other proprietary information relating to the Company's service's, customers, business plans, financial information or other information about the Company's business or the business of its customers.

53. Sias further certified at termination that he had complied will all terms of his Confidentiality/Invention Assignment Agreement, including returning to L-3 all documents or property that fall within the agreement's definition of "Confidential Information."

## Defendant Jeffrey Szekely's Relationship with L-3

54. Unlike Sias, Defendant Szekely has no technical background, but rather a sales and marketing background.

55. L-3 retained Szekely as a sales and marketing consultant to promote and market BII's BIT™ product line through two separate consulting agreements dated June 26, 2006 and May 10, 2008, respectively, which created a continuous period of service from June 28, 2006 until early December 2008. **Exhibits A and B.**

56. Specifically, Szekely was to develop a commercial market in the United States for the SteraMist™ systems, and to begin the sales and marketing process by cultivating relationships, a website, and marketing and sales materials.

57. Prior to beginning his consulting arrangement with L-3, Szekely knew virtually nothing of the technology embodied in the SteraMist™ devices, know-how related to them, or technology in the various BII patents on disinfection, including those mentioned above.

58.    Almost immediately after signing the June 2006 contract, Szekely learned about

L-3's entire SteraMist™ product line, including its SteraMist™

- room fogger,
- hand disinfector,
- chamber disinfector,
- surgical hands disinfector, and
- sprayer.

59.    Szekely's tasks under the agreements included, but were not limited to:

performing demonstrations of SteraMist™ in nursing homes and hospitals; drafting SteraMist™

service agreements; drafting SteraMist™ tissue bank beta trial agreements; establishing

relationships on behalf of L-3 with hospital beta trial targets; drafting SteraMist™ pricing

structure/cost analysis for the hospital market; drafting the SteraMist™ website, literature and

liability of use plans; drafting SteraMist™ sales and distribution plans; and finalizing all of the

foregoing drafts and plans.

60.    Each of the L-3/Szekely contracts contains provisions designed specifically to

protect L-3's Confidential Information and Intellectual Property, and prohibit Szekely or his

employees from engaging in activities creating actual or perceived conflicts of interest.  A

violation of any of these provisions permitted L-3 to immediately terminate the Consulting

Agreement for cause.

61.    The L-3/Szekely contracts' Confidentiality provision states in relevant part as

follows:

> Consultant shall keep in strictest confidence all information relating to this
> Agreement, as well as any information which may be acquired in connection
> with, or as a result of this Agreement. ... During the term of this Agreement and
> thereafter, Consultant shall not publish, communicate, divulge, disclose or use
> for its own benefit or the benefit of any other person, firm, corporation any such
> information, or any other information which from the surrounding circumstances
> ought to be treated as proprietary, unless specifically directed to do so, in writing
> by L-3 [].  Upon termination or expiration of this Agreement, Consultant shall

deliver all records, data, information, and other documents created by Consultant or received by Consultant under this Agreement, including any copies thereof (whether electronic or paper), to L-3 []. All such information and data shall remain the sole property of L-3 [].

**Exhibit A, ¶ 13; Exhibit B, ¶ 13.**

62.     The L-3/Szekely contracts further provided that all intellectual property created prior to or during the term of his contracts, including any intellectual property created by Szekely during the term of his contracts, remained the sole property of L-3.

63.     The L-3/Szekely contracts' Conflict of Interest provision states in relevant part as follows:

> Consultant and its employees, if any, shall avoid all circumstances and actions which would place Consultant in a position of a conflict of interest or divided loyalty with respect to the obligations and responsibilities to L-3 [] undertaken under this Agreement. Consultant shall not act as a sales agent, consultant, or in a liaison capacity as an officer, employee, agent or representative ... for any of L-3 []'s competitors or prospective competitors without the prior written approval of L-3 [] if such representation or consulting effort could be considered to be in conflict with the Consultant's work under this Agreement or L-3[]'s business or competitive interests. Consultant hereby warrants that it has no current conflict of interest with regard to providing the services required under this Agreement. Consultant further agrees that it shall immediately advise L-3 [], in writing, if a conflict of interest or potential conflict of interest arises.

**Exhibit A, ¶ 11; Exhibit B, ¶ 11.**

64.     In the process of performing his duties under the contracts, Szekely received highly confidential and trade secret L-3 information and technology, including, but not limited to: lists and contact information for potential customers, including hospitals, nursing homes and tissue banks; confidential cost and pricing information for L-3's SteraMist™ line of products; proprietary and trade secret technology relating to the SteraMist™ device; confidential modifications for improving the commercial viability of the SteraMist™ device, and much more.

**Sias, Szekely and others Conspire and Use L-3 Technology
to Create a Competing Business and a Competing Patent**

65.     From approximately mid-2007 through approximately September 2008, Sias was Szekely's supervisor, overseeing all of Szekely's SteraMist™-related marketing activities, as well as approving and processing Szekely's invoices and steady increases to Szekely's consulting rates.

66.     From approximately January 2007 through November 2008 Szekely submitted invoices to L-3 for nearly 40 hours of work each week, plus thousands of dollars in travel expenses each month, all of which were paid by L-3.

67.     Szekely billed L-3 for time he did not devote to his obligated tasks.

68.     As a result of his work with L-3, Szekely became aware of the vast potential for commercial success and profitability of L-3's novel technology.

69.     On or about September 24, 2007, Szekely submitted a proposal to Lou Montoulli and James Stuhmiller of L-3 to become the "Exclusive Master Distributor" for the entire SteraMist™ product line in all industry sectors in all of North America.

70.     Under his proposal, Szekely would have made a tremendous financial profit.

71.     L-3 rejected Szekely's proposal.

72.     At around the same time and while under contract with L-3, Szekely decided to misappropriate L-3's patented technology, proprietary technology and trade secrets for his own personal profit.

73.     In 2007 while still under contract with L-3, Szekely launched his new company, Defendant ADTec.

74.     ADTec's website describes the company as follows, "ADTec began in 2007 as a research and development company to develops [sic] innovative disinfection products, patents [sic] them, and bring them to market...."



ADTec
Advanced Disinfection Technologies, LLC

888-562-0001

Downloads ►►

Home
Products
Solutions
Services
Partners
About Us
Contact Us

## About Us

ADTec began in 2007 as a research and development company to develops innovative disinfection products, patents them, and bring them to market working with engineering, manufacturing and distribution partners.

In 2008 ADTec developed and patented the MRA™ disinfection technology and began our development of the **Ultra-D** product line for commercial applications.

Today ADTec manufactures and distributes our Ultra-D Room Fogger and Ultra-D Chamber products to many different markets through our Authorized Service Providers and Authorized Resellers.

We are currently developing and testing our **Ultra-D** Hands, Surgical Hands and Sprayer products for release in 2010.

**Ultra-D** Room Fogger™
**Ultra-D** Chamber™
**Ultra-D** Hands™
**Ultra-D** Surgical Hands™
**Ultra-D** Sprayer™

**Purchase Ultra-D** products & services from Authorized **Distributors** and **Service Providers**.

**Research & Development**
ADTec is a leader in basic and applied disinfection research employing hydroxyls - to kill microorganisms with advanced technology.

**Engineering & Production**
ADTec products are engineered and manufactured - to the highest quality levels applying ISO quality standards and rigorous reliability testing.

**Field Testing**
All ADTec products undergo exhaustive field testing and efficacy validations by third-party testing labs. All protocols and efficacy data is published for public review.

Copyright © Advanced Disinfection Technologies, LLC 2010. All rights reserved.

*See* http://www.adtecbio.com/aboutus.htm, visited June 14, 2010.

75. Szekely and Defendant Stolz together formed ADTec.

76. Stolz does not have a technical background, but rather a business and marketing background.

77. In around late 2007 or early 2008, Szekely invited Sias to join Szekely and Stolz in launching ADTec to commercialize a line of products based on binary ionization technology misappropriated from L-3.

78. Sias accepted Szekely's invitation.

79.     Under the guise of Szekely's consulting contracts with L-3, and Sias's supervision of them, and in furtherance of their scheme to misappropriate Plaintiffs' technology, Sias and Szekely began communicating regarding the details of binary ionization technology, the design of products such as room foggers, chambers and spray nozzles, as well as the efficacy of those products, including specific trade secret test results.

80.     In furtherance of a scheme to defraud and misappropriate Plaintiffs' technology, Sias and Szekely communicated over the internet via email.

81.     Sias had an idea to improve the SteraMist™ products, particularly the room fogger, by using magnetism—specifically particularly magnetism applied by Helmholtz coils— to align hydrogen peroxide molecules prior to activating them, to achieve a higher rate of activation (more ROS), and thus a greater kill/efficacy rate.

82.     To that end, while employed by L-3, Sias conducted research on Helmholtz coils in March 2008 using L-3's resources and facilities, during his working hours.

83.     On about March 28, 2008, during his regular work hours, Sias downloaded onto his work computer a "Helmholtz Coil Manual" published by ETS Lindgren, an ESCO Technological Company.

84.     In late May and early June 2008, both Szekely and Sias participated in testing of SteraMist™ room foggers at Lee Memorial Hospital in Fort Myers, Florida.

85.     Shortly thereafter, in June 2008, Szekely and Stolz filed, or had an agent file on their behalf, ADTec's Articles of Incorporation in Michigan.

86.     On information and belief, Szekely owns 92% of ADTec, while Stolz owns 8%.

87.     On information and belief, on or before September 8, 2008, while he was still an L-3 employee, Sias drafted a provisional patent application entitled, "Nuclear Resonance

Activation of Polar Solutions," that contained a detailed description of his idea regarding the use of Helmholtz coils to align hydrogen peroxide molecule.

88.     Because Sias was an employee of L-3 at the time, and by virtue of that employment and the L-3/Sias Confidentiality/Assignment of Invention Agreement, L-3 owned the invention described in the provisional patent application.

89.     On information and belief, on or before September 8, 2008, in violation of the L-3/Sias Confidentiality/Assignment of Invention Agreement, Sias transmitted to Szekely and/or Stolz, Sias's draft of a provisional patent application entitled, "Nuclear Resonance Activation of Polar Solutions."

90.     On information and belief, on or before September 8, 2008, Szekely and Stolz reviewed Sias's draft provisional patent application entitled, "Nuclear Resonance Activation of Polar Solutions."

91.     On September 8, 2008, Szekely, Stolz and/or an agent on their behalf, falsely naming Stolz as the sole inventor, filed Sias's provisional patent application entitled "Nuclear Resonance Activation of Polar Solutions" that was, in fact, invented by Sias as an L-3 employee and thus belonged solely to L-3.

92.     In October and November, 2008, L-3 became suspicious of Szekely's invoices, which represented that he had been spending 8 hours each day on promoting L-3's SteraMist™ line of products, but with no work product to show for such large amounts of time billed.

93.     In about early November, 2008, L-3 asked Szekely for justification and an explanation of his billing, which he was unable to fully provide.

94.     The L-3/Szekely contracts officially terminated with no chance of renewal on December 3, 2008.

**The Sias-Szekely Conspiracy Continues After Szekely Leaves L-3**

95.      On December 3, 2008, Sias knew that Szekely had been terminated.

96.      On December 9, 2008, Sias emailed to Szekely a power point presentation explaining in lay terms with pictures and diagrams, how the use of magnetism and Helmholtz coils would align hydrogen peroxide molecules, which, then along with a low level application of radio frequency ("RF") energy, activate the molecules, creating the dissociation which causes the OH that reacts with carbon bonds in microbes, thus killing them through an oxidation-reduction ("redox") reaction.

97.      Sias's power point presentation included chemical reactions, explanations of them, block diagrams of the entire system and of the activation chamber, and pictures of Helmholtz coils, including the following diagram:



Magnetic field lines for
Helmholtz coils.

98.    The contents of Sias's power point presentation were nearly identical to Sias's draft of the provisional patent application entitled, "Nuclear Resonance Activation of Polar Solutions."

99.    Indeed, in his draft of the provisional patent application, Sias included a nearly identical block diagram of the entire system, as well as the following:



100.    On December 21, 2008, via email, Szekely invited Sias to participate in a phone conversation with Szekely and others regarding the engineering of a knock-off ADTec room fogger containing L-3's patented, proprietary and trade secret technology.

101.    On about December 22, 2008, Sias, Szekely, Stolz and others participated in a phone conversation regarding building a room fogger containing L-3's misappropriated technology.

102.    Construction of such a room fogger began immediately after the December 22, 2008 phone call.

103. . Issues arose relating to supplying energy to the stream of hydrogen peroxide aerosol as it progressed through Helmholtz coils.

104. On January 8, 2009, in furtherance of the scheme, Sias drafted an invention disclosure entitled, "Activation of Hydrogen Peroxide Using Low Power RF In a Resonant Cavity."

105. On January 9, 2009, in furtherance of the scheme, Sias emailed his invention disclosure statement to Fernando Feria, BII's president, for approval and funding.

106. Sias intended to use this funding from his employer, L-3, to order equipment to conduct tests for equipment that he was, in fact, developing for Szekely and ADTec, in furtherance of their scheme.

107. Sias's January 8, 2009 invention disclosure was nearly identical to the provisional patent application entitled, "Nuclear Resonance Activation of Polar Solutions" filed falsely in the name of Paul Stolz on September 8, 2008.

108. Believing Sias was attempting to further develop BII's and L-3's disinfecting technology, and believing that L-3 owned the technology described in Sias's invention disclosure, Mr. Feria approved Sias's request to allocate funding.

109. On February 12, 2009, in furtherance of the scheme, Sias had another L-3 employee order five EMCO G10 high voltage converters.

110. The EMCO converters were received at BII's offices at 10770 Wateridge Circle, Suite 200, San Diego, California, 92121 on about May 8, 2009.

111. Sias conducted experiments using the EMCO G10 high voltage converters in late May and/or early June 2009 while working in Plaintiffs' facilities and using Plaintiffs' resources.

112.    On information and belief, Sias transmitted the results, which were proprietary to L-3, to Szekely, Stolz, Mark Hale and the law firm of Brooks Kushman.

113.    On June 15, 2009, while Sias was still an employee of L-3, Sias signed an Inventor's Oath on a patent application entitled, "Magnetically Modified Aerosol Decontamination Apparatus and Method."

114.    The patent application was filed on June 15, 2009.

115.    Along with Sias, the patent application names Szekely, Stolz and Hale as co-inventors.

116.    The patent application claimed priority to the provisional application filed by Stolz on September 8, 2008, discussed above.

117.    The United States Patent and Trademark Office published the patent application on March 11, 2010, bearing publication number 2010/0061888 ("the '888 publication").

118.    The '888 publication is assigned to Defendant ADTec.

119.    The '888 publication includes reference to the EMCO G10 high voltage converters as a "suitable charging ring" to be used in the invention, based on tests that were performed by Sias at L-3 and purchased with L-3 funds.

120.    The '888 publication also reveals L-3's proprietary trade secret information relating to the use of magnetism and modifying and activating the cleaning aerosol.

121.    The '888 publication also discusses disinfection tests which were performed, on information and belief, in six hospital rooms at Lee Memorial Hospital in Ft. Myers, Florida on February 11-13, 2009, while Sias was still an employee of L-3.

122.    The tests performed at Lee Memorial Hospital were done with an Ultra-D prototype room fogger built from trade secret technology misappropriated from L-3, including technology contained in the '888 publication.

123.    The Ultra-D prototype room fogger used in the Lee Memorial tests infringed at least BII's '592 patent, and possibly others.

124.    L-3 terminated Sias from L-3 as part of a reduction in work force at around the same time in March 2010.

125.    ADTec manufactures and distributes disinfection technology called the "Ultra-D Room Fogger."

126.    The "Ultra-D Room Fogger" infringes BII's '592 and '487 patents.

127.    ADTec manufactures and distributes disinfection technology called the "Ultra-D Chamber."

128.    The Ultra-D Chamber infringes BII's '592 patent.

129.    ADTec advertises and offers for sale "Ultra-D Hands," "Ultra-D Surgical Hands," and "Ultra-D Sprayer" in 2010.

130.    "Ultra-D Hands" infringes BII's '425 and '243 patents.

131.    "Ultra-D Surgical Hands" infringes BII's '425 and '243 patents.

132.    "Ultra-D Sprayer" infringes BII's '487 patent.

133.    Szekely, Sias, ADTec, and the other Defendants have misappropriated and are profiting off of L-3's entire SteraMist™ product line.

134.    Szekely has disclosed L-3 confidential information and trade secrets to at least Sias, Stolz and Hale.

135.   Through his new company, and using confidential, trade secret and patented technology owned by L-3, Szekely and ADTec are doing business in the same market and with the same customers as L-3.

136.   Szekely's customers are the same customers he cultivated for L-3, while under contract with L-3.

137.   On about October 13, 2009, TOMI Environmental Solutions, Inc. ("TOMI"), one of L-3's competitors in the commercial disinfection market, announced its intention to acquire 100% equity interest in ADTec.

138.   TOMI is acquiring ADTec so that it can obtain L-3's proprietary technology which is embodied in the Ultra-D product line.

139.   TOMI, upon completion of its acquisition of ADTec, will also acquire L-3's trade secrets, including customer lists, sales techniques, cost and pricing information, user manuals, research, secret data, and improvements discovered by L-3.

140.   TOMI is already marketing, advertising and selling the infringing Ultra-D Room Fogger.  See http://www.theozoneman.com/divisions.php; and http://www.theozoneman.com/Hospital_services_packet.pdf.

141.   Szekely has also initiated a second business venture named Infection Control Solutions, Inc. ("ICS"), which advises potential clients on infection control and remediation, and steers customers to ADTec and the infringing Ultra-D through a link on ICS's website homepage: http://www.infectioncontrolonline.com/welcome.php.

142.   ICS's website advertises a case study performed at Lee Memorial Health System ("LMHS") using ADTec's Ultra-D fogger, written by Stephen Streed.  Mr. Streed had previously entertained a SteraMist ™ fogger demonstration presented by Szekely and Sias in June 2008.

143.    Also in around October, 2009, it came to L-3's attention that Szekely and ADTec were manufacturing and marketing room foggers that infringe L-3's patents, and were using proprietary and trade secret information developed to market L-3's SteraMist™.

144.    In an attempt to resolve this issue, on about October 19, 2009, L-3 sent a letter to Szekely asking him to cease and desist the behavior complained of herein, reminding him of his obligations under his contracts with L-3.

145.    On about November 3, 2009, L-3 received a letter from Szekely's lawyers indicating that Mr. Szekely would not cease and desist, and would instead "aggressively pursue all remedies against L-3," if L-3 were to take further action against Szekely.

146.    On or about November 20, 2009, Michigan attorney Clifford Marko registered ADTec as a foreign limited liability company in Ohio, naming Szekely as the company's registered agent.

## COUNT I
### (Infringement of the '592 Patent Against All Defendants)

147.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-146 above.

148.    This is a claim by BII against each defendant for infringement of the '592 patent under 35 U.S.C. § 271.

149.    By, among other things, making, using, offering for sale and/or selling disinfection/decontamination products, including but not limited to room foggers and chambers, which meet each properly construed element of each claim of the '592 patent, Defendants are directly infringing, actively inducing and contributing to the infringement of '592 patent without permission from BII and will continue to do so unless enjoined by this Court.

150.    Defendants' infringement of the '592 patent has been knowing, deliberate and willful, justifying the assessment of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285 against each Defendant.

151.    Defendants, especially Sias, a named inventor of the '592 patent, knew or should have known of the '592 patent.

152.    Defendants acted despite an objectively high likelihood that their actions infringed the '592 patent.

153.    BII has been damaged by Defendants' willful infringement of the '592 patent and has been and will continue to be irreparably harmed unless such infringing activities are preliminarily and permanently enjoined by this Court.

154.    BII is entitled to recover damages adequate to compensate for the willful infringement.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally and request the following relief:

(a)    A judgment that Defendants have infringed, are infringing, have induced and are inducing, and have contributed and are contributing to the infringement of the '592 patent by, among other things, importing, making, using, offering for sale and/or selling disinfection/decontamination defoggers that infringe BII's '592 patent;

(b)    A permanent injunction under 35 U.S.C. § 283 issued against all Defendants, their officers, agents, servants, employees, and attorneys, all parent and subsidiary corporations, their assigns and successors in interest, and those persons acting in active concert or participation with them, including distributors and customers, enjoining them from continuing acts of infringement, active inducements of infringement, and contributory infringement of BII's '592 patent;

(c)     An accounting of damages under 35 U.S.C. § 284 for infringement of BII's '592 patent by Defendants and such damages awarded to BII's, together with interest as provided by law;

(d)     A judgment that Defendants are willful infringers and an award of treble damages to BII pursuant to 35 U.S.C. § 284 against Defendants;

(e)     A judgment that this is an exceptional case under 35 U.S.C. § 284, and that BII be awarded its reasonable attorneys' fees and costs;

(f)     All such other and further relief that this Court deems just and proper.

## COUNT II
### (Infringement of the '425 Patent Against All Defendants)

155.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-154 above.

156.    This is a claim by BII against each defendant for infringement of the '425 patent under 35 U.S.C. § 271.

157.    By, among other things, making, using, offering for sale and/or selling disinfection/decontamination products, including but not limited to hands and surgical hands products, which meet each properly construed element of each claim of the '425 patent, Defendants are directly infringing, actively inducing and contributing to the infringement of '425 patent without permission from BII and will continue to do so unless enjoined by this Court.

158.    Defendants' infringement of the '425 patent has been knowing, deliberate and willful, justifying the assessment of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285 against each Defendant.

159.    Defendants, especially Sias, a named inventor of the '425 patent, knew or should have known of the '425 patent.

160.    Defendants acted despite an objectively high likelihood that their actions infringed the '425 patent.

161.    BII has been damaged by Defendants' willful infringement of the '425 patent and has been and will continue to be irreparably harmed unless such infringing activities are preliminarily and permanently enjoined by this Court.

162.    BII is entitled to recover damages adequate to compensate for the willful infringement.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally and request the following relief:

(a)     A judgment that Defendants have infringed, are infringing, have induced and are inducing, and have contributed and are contributing to the infringement of the '425 patent by, among other things, importing, making, using, offering for sale and/or selling disinfection/decontamination defoggers that infringe BII's '425 patent;

(b)     A permanent injunction under 35 U.S.C. § 283 issued against all Defendants, their officers, agents, servants, employees, and attorneys, all parent and subsidiary corporations, their assigns and successors in interest, and those persons acting in active concert or participation with them, including distributors and customers, enjoining them from continuing acts of infringement, active inducements of infringement, and contributory infringement of BII's '425 patent;

(c)     An accounting of damages under 35 U.S.C. § 284 for infringement of BII's '425 patent by Defendants and such damages awarded to L-3, together with interest as provided by law;

(d)     A judgment that Defendants are willful infringers and an award of treble damages to BII pursuant to 35 U.S.C. § 284 against Defendants;

26

(e)  A judgment that this is an exceptional case under 35 U.S.C. § 284, and that BII be awarded its reasonable attorneys' fees and costs;

(g)  All such other and further relief that this Court deems just and proper.

## COUNT III
### (Infringement of the '243 Patent Against All Defendants)

163.  Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-162 above.

164.  This is a claim by BII against each defendant for infringement of the '243 patent under 35 U.S.C. § 271.

165.  By, among other things, making, using, offering for sale and/or selling disinfection/decontamination products, including but not limited to hands and surgical hands products, which meet each properly construed element of each claim of the '243 patent, Defendants are directly infringing, actively inducing and contributing to the infringement of '243 patent without permission from BII and will continue to do so unless enjoined by this Court.

166.  Defendants' infringement of the '243 patent has been knowing, deliberate and willful, justifying the assessment of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285 against each Defendant.

167.  Defendants, especially Sias, a named inventor of the '243 patent, knew or should have known of the '243 patent.

168.  Defendants acted despite an objectively high likelihood that their actions infringed the '243 patent.

169.  BII has been damaged by Defendants' willful infringement of the '243 patent and has been and will continue to be irreparably harmed unless such infringing activities are preliminarily and permanently enjoined by this Court.

170.   BII is entitled to recover damages adequate to compensate for the willful infringement.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally and request the following relief:

(a)   A judgment that Defendants have infringed, are infringing, have induced and are inducing, and have contributed and are contributing to the infringement of the '243 patent by, among other things, importing, making, using, offering for sale and/or selling disinfection/decontamination defoggers that infringe BII's '243 patent;

(b)   A permanent injunction under 35 U.S.C. § 283 issued against all Defendants, their officers, agents, servants, employees, and attorneys, all parent and subsidiary corporations, their assigns and successors in interest, and those persons acting in active concert or participation with them, including distributors and customers, enjoining them from continuing acts of infringement, active inducements of infringement, and contributory infringement of BII's '243 patent;

(c)   An accounting of damages under 35 U.S.C. § 284 for infringement of BII's '243 patent by Defendants and such damages awarded to BII, together with interest as provided by law;

(d)   A judgment that Defendants are willful infringers and an award of treble damages to BII pursuant to 35 U.S.C. § 284 against Defendants;

(e)   A judgment that this is an exceptional case under 35 U.S.C. § 284, and that L-3 [BII?] be awarded its reasonable attorneys' fees and costs;

(f)   All such other and further relief that this Court deems just and proper.

<u>COUNT IV</u>
**(Infringement of the '487 Patent Against All Defendants)**

171.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-170 above.

172.    This is a claim by BII against each defendant for infringement of the '487 patent under 35 U.S.C. § 271.

173.    By, among other things, making, using, offering for sale and/or selling disinfection/decontamination products, including but not limited to a room fogger and chamber, which meet each properly construed element of each claim of the '487 patent, Defendants are directly infringing, actively inducing and contributing to the infringement of '487 patent without permission from BII and will continue to do so unless enjoined by this Court.

174.    Defendants' infringement of the '487 patent has been knowing, deliberate and willful, justifying the assessment of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 35 U.S.C. § 285 against each Defendant.

175.    Defendants, especially Sias, a named inventor of the '487 patent, knew or should have known of the '487 patent.

176.    Defendants acted despite an objectively high likelihood that their actions infringed the '487 patent.

177.    BII has been damaged by Defendants' willful infringement of the '487 patent and has been and will continue to be irreparably harmed unless such infringing activities are preliminarily and permanently enjoined by this Court.

178.    BII is entitled to recover damages adequate to compensate for the willful infringement.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally and request the following relief:

(a)      A judgment that Defendants have infringed, are infringing, have induced and are inducing, and have contributed and are contributing to the infringement of the '487 patent by, among other things, importing, making, using, offering for sale and/or selling disinfection/decontamination defoggers that infringe BII's '487 patent;

(b)      A permanent injunction under 35 U.S.C. § 283 issued against all Defendants, their officers, agents, servants, employees, and attorneys, all parent and subsidiary corporations, their assigns and successors in interest, and those persons acting in active concert or participation with them, including distributors and customers, enjoining them from continuing acts of infringement, active inducements of infringement, and contributory infringement of BII's '487 patent;

(c)      An accounting of damages under 35 U.S.C. § 284 for infringement of BII's '487 patent by Defendants and such damages awarded to L-3, together with interest as provided by law;

(d)      A judgment that Defendants are willful infringers and an award of treble damages to BII pursuant to 35 U.S.C. § 284 against Defendants;

(e)      A judgment that this is an exceptional case under 35 U.S.C. § 284, and that BII be awarded its reasonable attorneys' fees and costs;

(f)      All such other and further relief that this Court deems just and proper.

## COUNT V
### (Violation of the Virginia Uniform Trade Secrets Act Against Defendant Szekely)

179.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-178 above.

180.    This is a claim by L-3 against Defendant Szekely for trade secret misappropriation in violation of the Virginia Uniform Trade Secrets Act., Va. Code Ann. § 59.1-336 *et seq*. (the "VUTSA").

181.    Defendant Szekely acquired and/or disclosed one or more of L-3's trade secrets and Szekely misappropriated the trade secret.

182.    Szekely misappropriated L-3's trade secret information, including, but not limited to, proprietary know-how, modifications to its BIT devices, formulas, patterns and compilations including customer lists, technical presentations, marketing presentations, names and contact information, programs, devices, methods, techniques, and/or processes.

183.    This L-3 trade secret information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons.

184.    Other persons or companies who obtain L-3's trade secret information can obtain economic value from its disclosure or use.

185.    L-3's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

186.    Szekely, while under the constraints of the L-3/Szekely contracts, gained access to L-3's trade secrets.

187.    Szekely has disclosed L-3's trade secrets to at least co-Defendants Stolz, Hale and ADTec, and likely to TOMI, ICS and others including other competitors.

188.    By virtue of the publication of the '888 patent application, Defendants have now disclosed L-3's trade secret technology to the world.

189.    Defendants are using L-3's trade secret customer list information to usurp L-3's potential clientele for themselves.

190.    Defendants are using L-3's trade secret pricing, service and cost structure to price their own products favorably.

191.    Defendants are gaining and attempting to gain economic benefit from commercial use of L-3's trade secrets.

192.    Szekely's and the other Defendants' use of L-3's trade secrets is undercutting L-3's relationships with its own customers and potential customers, and is causing irreparable harm.

193.    Defendants Szekely and/or ADTec are also making false statements regarding being the inventors of L-3's proprietary technology.

194.    Szekely's and the other Defendants' use and/or disclosure of L-3's trade secrets is without express or implied consent.

195.    At the time of the disclosure, Szekely knew or should have known that his knowledge of L-3's trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use.

196.    Defendant Szekely's disclosure of L-3's trade secrets is a violation of his contract with L-3, as well as the VUTSA.

197.    Unless enjoined, Szekely's misappropriation of L-3's trade secrets will continue to irreparably harm L-3.

WHEREFORE, Plaintiffs demand judgment against Szekely for those damages described in the foregoing paragraphs in the amount of $15,000,000, or in such additional amount to be proven at trial, plus attorneys' fees, interest, costs, attorneys' fees and such other and further

relief the Court deems just and proper. Plaintiffs further demand an award of appropriate punitive damages pursuant to Va. Code § 59.1-338(b). Plaintiffs further request that the Court enter a permanent injunction pursuant to Va. Code § 59.1-337, enjoining Szekely and the other Defendants from further actual and/or threatened use and disclosure of Plaintiffs' misappropriated trade secrets.

<div align="center">

**COUNT VI**
**(Breach of Contract Against Defendant Szekely)**

</div>

198.     Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-197 above.

199.     This is a claim by L-3 against Defendant Szekely for breach of contract.

200.     L-3's contract with Szekely required him to keep all information confidential.

201.     L-3's contract with Defendant Szekely required him to transfer any and all intellectual property rights, including but not limited to copyright, trademark and patent rights to L-3.

202.     L-3's contracts with Defendant Szekely stated specifically that the legally enforceable requirements of confidentiality and intellectual property survived the term of the contracts, and existed in perpetuity.

203.     L-3's contract with Defendant Szekely created a legally enforceable obligation on him to avoid all circumstances and actions which would create a conflict of interest or divided loyalty regarding its obligations to L-3 under the contract.

204.     L-3's contract with Defendant Szekely created a legally enforceable obligation on him to conduct himself at all times in a manner consistent with L-3's Code of Ethics and Standards of Conduct.

205.    Szekely's formation of ADTec and disclosure of L-3's confidential information and trade secrets to others breach Szekely's contracts with L-3.

206.    Szekely's filing of the '888 patent application and other use of L-3's intellectual property also breach Szekely's contracts with L-3.

207.    Szekely is in the process of selling ADTec to TOMI, a move that, on information and belief, has or will cause Szekely to disclose confidential L-3 information in breach of Szekely's contract.

208.    Szekely's formation of Infection Control Solutions constitutes a breach of each of these obligations under Szekely's contract with L-3.

209.    Szekely will breach and/or continue to breach the confidentiality, intellectual property and conflict of interest provisions of the contract unless enjoined by this Court.

210.    L-3 has been damaged by Szekely's breach of contract in an amount in excess of the price TOMI is paying to acquire L-3's technology from Szekely, or approximately $ 5,000,000.00 (five million dollars).

211.    L-3 has suffered and continues to suffer irreparable harm each day Szekely is permitted to continue to breach his contract with L-3.

WHEREFORE, Plaintiffs demand judgment against Szekely for those damages described in the foregoing paragraphs in the amount of $15,000,000, or in such additional amount to be proven at trial, plus attorneys' fees, interest, costs, and such other and further relief the Court deems just and proper. Plaintiffs further request that the Court enter a permanent injunction enjoining Szekely further breaching his contractual obligations to L-3.

## COUNT VII
### (Violation of the California Trade Secrets Act Against Defendant Sias)

212.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-211 above.

213.    This is a claim by L-3 against Defendant Sias for trade secret misappropriation in violation of the California Trade Secrets Act., Cal. Civil Code § 3421 *et seq.* (the "CATSA").

214.    Defendant Sias acquired and/or disclosed one or more of L-3's trade secrets and with Szekely and the other Defendants misappropriated the trade secrets.

215.    Sias misappropriated L-3's trade secret information, including, but not limited to, proprietary know-how, including trade secret modifications to its BIT™ devices, including specifically the technology disclosed in the provisional patent application filed on September 9, 2008, and which falsely names Paul Stolz as its inventor.

216.    Sias further misappropriated L-3 trade secret information, including, but not limited to, proprietary know-how, including trade secret modifications to its BIT™ devices, including specifically the technology disclosed in the '888 patent publication.

217.    This L-3 trade secret information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons.

218.    Other persons or companies who obtain L-3's trade secret information can obtain economic value from its disclosure or use.

219.    L-3's trade secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

220. Sias, while under the constraints of the L-3/Sias Confidentiality and Patent Assignment Agreement, gained access to or created the trade secrets which are the subject of this Count.

221. In violation of the L-3/Sias Confidentiality and Patent Assignment Agreement, Sias knowingly disclosed L-3's trade secrets to at least co-Defendants Szekely, Stolz, Hale and ADTec, and likely to TOMI, ICS, the Brooks Kushman law firm and others, none of whom were entitled to receive such information.

222. By virtue of the publication of the '888 patent application, Sias and the other Defendants have now disclosed L-3's trade secret technology to the world.

223. Sias and the other Defendants are using L-3's trade secret customer list information to usurp L-3's potential clientele for themselves.

224. Sias and the Defendants are using L-3's trade secret pricing, service and cost structure to price their own products favorably.

225. Sias and the other Defendants are gaining economic benefit, and are attempting to gain further substantial economic benefit from commercial use of L-3's trade secrets.

226. Sias's and the other Defendants' use of L-3's trade secrets is undercutting L-3's relationships with its own customers and potential customers, and is causing irreparable harm.

227. Sias's and the other Defendants' use and/or disclosure of L-3's trade secrets is without L-3's express or implied consent.

228. At the time of the disclosure, Sias knew or should have known that his knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use.

229.    Defendant Sias' disclosure of L-3's trade secrets is a violation of his contract with L-3, as well as the CATSA.

230.    Defendant Sias acted willfully and maliciously when he misappropriated L-3's trade secret information.

231.    Unless enjoined, Sias's misappropriation of L-3's trade secrets will continue to irreparably harm L-3.

WHEREFORE, Plaintiffs demand judgment against Szekely for those damages described in the foregoing paragraphs in the amount of $15,000,000, or in such additional amount to be proven at trial, plus interest, costs, and such other and further relief the Court deems just and proper.  Plaintiffs further request an award of double damages pursuant to Cal. Civ. Code § 3246.3 and attorneys' fees pursuant to Cal. Civ. Code § 3246.4.  Plaintiffs further request that the Court enter a permanent injunction pursuant to Cal. Civ. Code § 3246.2, enjoining Szekely and the other Defendants from further and/or threatened use and disclosure of Plaintiffs' misappropriated trade secrets.

## COUNT VIII
### (Breach of Contract Against Defendant Sias)

232.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-231 above.

233.    This is a claim by L-3 against Defendant Sias for breach of contract.

234.    L-3's contract with Sias required Sias to keep all information confidential.

235.    As mentioned above, on approximately November 20, 2002, Sias signed the L-3/Sias Confidentiality/Invention Assignment Agreement, which was a contract in writing.

236.    The L-3/Sias Confidentiality/Invention Assignment Agreement required Sias to retain the confidentiality of all confidential information during and after employment, and never to use it to the detriment of L-3, and never for Sias' own personal gain.

237.    The L-3/Sias Confidentiality/Invention Assignment Agreement also required Sias to assign and transfer to L-3 the entire right, title and interest in all inventions whether conceived in whole or part by him during his employment with L-3.

238.    Sias's disclosure of L-3's confidential information and trade secrets, including but not limited to his December 9, 2008 email to Szekely, deliberately, falsely and misleadingly labeled "LM Close Out" breached the L-3/Sias Confidentiality/Invention Assignment Agreement.

239.    Sias's drafting and disclosure of the provisional patent application filed on September 8, 2008, falsely representing Stolz as the sole inventor, to Szekely, Stolz and ADTec also breached the L-3/Sias Confidentiality/Invention Assignment Agreement.

240.    Sias participated with the other Defendants in preparing the '888 publication for filing with the United States Patent and Trademark Office, which filing occurred on June 15, 2009, while Sias was an employee of L-3.

241.    Sias's participation in preparing, and signing of the Inventor Oath on, the '888 application breached his obligations under the L-3/Sias Confidentiality/Invention Assignment Agreement.

242.    Sias will and/or continue to breach the L-3/Sias Confidentiality/Invention Assignment Agreement unless enjoined by this Court.

243.    L-3 has been damaged irreparably by loss of control of its trade secrets.

244. L-3 has suffered and continues to suffer irreparable harm each day Szekely is permitted to continue to breach his contract with L-3.

WHEREFORE, Plaintiffs demand judgment against Sias for those damages described in the foregoing paragraphs in the amount of $15,000,000, or in such additional amount to be proven at trial, plus attorneys' fees, interest, costs, and such other and further relief the Court deems just and proper. Plaintiffs further request that the Court enter a permanent injunction enjoining Sias further breaching his contractual obligations to L-3.

<u>COUNT IX</u>
**(RICO Violation Against All Defendants)**

245. Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1-244 above.

246. This is a claim by L-3 against Defendants for violation of 18 U.S.C. § 1962 et seq., and specifically 18 U.S.C. § 1962(a), (b), (c) and (d).

247. The enterprise is constituted by ADTec, as well as Szekely, Stolz, Sias and Hale.

248. Based on the statement on ADTec's website, activity reported in the media between ADTec and TOMI, and the recent publication of the '888 patent publication, the enterprise has been in existence since 2007 and continues through the present day.

249. The enterprise has a public façade, which appears to be a legitimate entity in the business of selling commercial disinfection technology.

250. However, the enterprise also engages in a pattern of illegal behavior, including misappropriation of trade secrets from L-3 and willful patent infringement, among other unlawful activity.

251.    Defendants have committed wire fraud in violation of 18 U.S.C. § 1343 by using the internet, phone and fax lines to illegally misappropriate trade secret and other confidential information, specifically including, but not limited to:

a.      Sias's December 9, 2008 email to Szekely, intentionally mislabeled "LM Closeout" to create an impression of legitimacy, when Sias intended to specifically educate Szekely regarding the trade secret magnetic resonance activation technology owned by L-3;

b.      Szekely's December 21, 2008 email to Sias, inviting him to participate in an "engineering meeting" to create an Ultra-D prototype using misappropriated L-3 technology; and

c.      Sias's transmission of June 15, 2009 containing his signature on an inventor's oath for a patent application reflecting proprietary L-3 technology that, instead, was to be filed on behalf ADTec,

d.      Numerous other e-mails were transmitted between Szekely and Sias in furtherance of the scheme, and under the guise of Szekely's consulting contract between October 2007 and December 2008 conveying test results, design improvement, scientific information and the like.

e.      On information and belief, discovery will reveal many more such email and wire fraud communications made in furtherance of the conspiracy.

252.    Each of the foregoing emails is an instance of wire fraud, the combination of which constitutes related and continuing predicate acts in furtherance of the scheme to defraud L-3 and BII of its valuable and proprietary technology.

253.    The email means of misappropriating Plaintiffs' technology continued through Sias's employment with L-3, which ended in March 2010.

254. The nexus between the enterprise and the pattern of racketeering is the involvement of Szekely and Sias.

255. Szekely, through December 3, 2008, appeared to have a legitimate reason to receive technical and other proprietary information from Sias by virtue of the L-3/Szekely contracts.

256. Sias, through December 3, 2008, appeared to have a legitimate reason to transmit technical information to Szekely by virtue of his position at L-3, and Szekely's consulting contracts with L-3.

257. In reality, Sias's transmission of technology and information was never intended by Sias or Szekely to be used to market the SteraMist™ product line on behalf of L-3.

258. Rather, Sias, Szekely and the other defendants intended to use the L-3's technology and information, obtained under the guise of Szekely's consulting agreement, to further their scheme and enrich themselves.

259. Szekely's role in the enterprise was, among other things, to receive proprietary information and technology from Sias, frequently via email, under the guise of legitimate consultancy work, but in reality to create products and services for his new company, Defendant ADTec.

260. Stolz's role was to found ADTec with Szekely, so as to create the appearance of a legitimate business enterprise.

261. Stolz also conspired with Szekely in organizing the enterprise, filing the fraudulent September 8, 2008 provisional patent application to create a false appearance that ADTec had research and development capabilities, and to manipulate potential L-3 customers,

such as ServiceMaster in Ft. Myers, Florida, to acquire L-3 SteraMist™ pricing, product
specification and efficacy information.

262.   Stolz's role continued with him developing marketing materials for ADTec's
knock-off Ultra-D line of products, falsely signing an inventor's oath and filing the '888 patent
publication.

263.   Hale's role in the enterprise, among other things, was to falsely sign an inventor's
oath, and falsely file the '888 patent application, which is, in truth, owned by L-3.

264.   Sias's role in the enterprise was to, under the guise of a proper relationship,
convey technical information, know-how and engineering expertise to the enterprise, through
Szekely, for the production and manufacture of the knock-off Ultra-D products and services.

265.   Sias's role in the enterprise was also to keep the enterprise apprised of whether
Plaintiffs had caught on to the enterprise, and whether in fact Plaintiffs had picked up on
Defendants' trail.

266.   ADTec's role in the enterprise is to create the appearance of a legitimate business
entity that provides innovative disinfection products and services through its own and others'
websites, including but not limited to Infection Control Solutions ("ICS").

267.   ADTec wrongly claims ownership of technology owned by Plaintiffs.

268.   All of the Defendants conspired with each other to achieve the goal of the
enterprise.

WHEREFORE, Plaintiffs demand judgment against the Defendants jointly and severally
for those damages described in the foregoing paragraphs, in the amount of $15,000,000, or in
such additional amount to be proven at trial, treble damages, costs, attorneys' fees and such other
and further relief the Court deems just and proper. Plaintiffs further request a permanent

injunction, enjoining Defendants from further and/or threatened use and disclosure of Plaintiffs'

misappropriated trade secrets.

<u>COUNT X</u>
**(Business Conspiracy under Virginia Law Against All Defendants)**

269.     Plaintiffs repeat and incorporate by reference the allegations set forth in

Paragraphs 1-268 above.

270.     This is a claim for Virginia Business Conspiracy under Va. Code Ann. § 18.2-499

and § 18.2-500.

271.     Defendants Szekely, Stolz, Sias, Hale and ADTec, agreed and conspired to

willfully and maliciously injure Plaintiffs in their business, trade and profession.

272.     In misappropriating Plaintiffs' confidential, proprietary and trade secret

information, and using Plaintiffs' inventions and technology to create a competing product and

patent the same, Defendants acted intentionally, purposefully and without legal justification.

273.     As a direct result of Defendants' actions including the conspiracy and Plaintiffs

having to defend their patents, Plaintiffs have suffered damages to their reputation, trade,

business and profession.

274.     Plaintiffs have also suffered irreparable and will continue to be harmed unless

Defendants are enjoined.

WHEREFORE, Plaintiffs demand judgment against the Defendants jointly and severally

for those damages described in the foregoing paragraphs, in the amount of $15,000,000, or in

such additional amount to be proven at trial, treble damages, costs, attorneys' fees and such other

and further relief the Court deems just and proper.  Plaintiffs further request a permanent

injunction, enjoining Defendants from further and/or threatened use and disclosure of Plaintiffs'

misappropriated trade secrets.

## COUNT XI
### (Violation of the Lanham Act Against ADTec)

275.    L-3 repeats and incorporates by reference the allegations set forth in Paragraphs 1-270 above.

276.    This is a claim for false advertising under the Lanham Act.

277.    ADtec has, in commercial advertising and promotion on its own and other Internet websites, misrepresented that it is the owner/inventor of the technology used in its "Ultra-D" disinfecting machines. Such misrepresentations have violated and continue to violate Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

278.    ADTec advertises and promotes five specific products that are virtually identical to five competing products in L-3's SteraMist product line: a room fogger, hand disinfector, chamber disinfector, surgical hands disinfector and a sprayer.

279.    ADTec's misleading promotion and advertising activities are likely to influence the purchasing decisions and deceive customers (including Plaintiffs' customers), into believing that ADTec's products use its own proprietary technology, and thus ADTec, as the owner/inventor of that technology, is best suited as the manufacturer/supplier of these five disinfection products.

280.    Such actions have injured and will likely continue to injure Plaintiffs by diverting sales and lessening the goodwill associated with Plaintiffs' products.

281.    ADTec's violation of 15 U.S.C. § 1125(a) are intentional and willful, and entitle Plaintiffs to recover from ADTec Plaintiffs' damages or ADTec's profits.

282.    ADTec's intentional and willful violations of 15 U.S.C. § 1125(a) entitle Plaintiffs to recover their reasonable attorney's fees and treble damages.

283.    ADTec's false and misleading representations and statements have irreparably injured Plaintiffs and will continue to do so unless enjoined.

WHEREFORE, Plaintiffs demand judgment against the Defendants jointly and severally for those damages described in the foregoing paragraphs, in the amount of $15,000,000, or in such additional amount to be proven at trial, treble damages, costs, attorneys' fees and such other and further relief the Court deems just and proper.  Plaintiffs further request a permanent injunction, enjoining ADTec from further stating or representing that that it is the owner and/or inventor of the MRA/BIT technology.

Of Counsel:

Suzanne M. Parker
PARKER INTELLECTUAL PROPERTY
LAW, PC
1610 West Street, Suite 108
Annapolis, MD 21401
Telephone:  (410) 777-5231
Facsimile: (410) 216-9001
E-mail:  sparker@parkeriplaw.com

Respectfully submitted,

Benjamin G. Chew, Esq. (VSB#29113)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315
E-mail:  bchew@pattonboggs.com

Counsel for Plaintiffs L-3 Services, Inc. and
Binary Ionization, Inc.

Dated: June 21, 2010